Pasquale *v.* Chandler.

———

DAVID B. PASQUALE, administrator, *vs.* CHARLES F. CHANDLER & another.

Worcester. October 8, 1965. — March 24, 1966.

Present: SPALDING, WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Limitations, Statute of. Negligence,* Doctor. *Assault. Death. Statute, Construction. Words,* "Accrues."

An action for death from a surgical operation in which a clamp about eight inches long was left in the decedent's abdominal cavity when the incision was closed, commenced against the operating surgeon and an assisting physician seven months after discovery of the clamp by X-ray but more than two years after the operation, was barred by the two year limitation stated in G. L. c. 229, § 2C.  [455]

Where it appeared that, after the period of limitation for actions for malpractice established by G. L. c. 260, § 4, had been long interpreted by this court as commencing upon accrual of the cause of action by the act

of malpractice, the Legislature considered proposed legislation which in part would have made the period of limitation commence upon discovery of the cause of action by the injured party, but enacted legislation merely extending the period of limitation by one year, it must be held that the Legislature rejected the "discovery" theory and reaffirmed the policy of § 4 as previously interpreted.   [455–458]

An action of tort for malpractice against a surgeon who performed an operation in which a clamp was left in the patient's abdominal cavity when the incision was closed and who terminated his participation in the care of the patient a week after the operation was barred by the statute of limitations, G. L. c. 260, § 4, as amended through St. 1960, c. 271, where it was not commenced until more than two years after such termination.   [458]

At the trial of an action of tort for malpractice against a physician for alleged failure to diagnose and treat a patient properly following a surgical operation in which a clamp was left in the patient's abdominal cavity by the surgeon when the incision was closed, commenced more than six years after the operation and about seven months after discovery of the clamp by X-ray, a finding that the defendant, who had treated the patient for about six years, was negligent in his care of the patient within two years before the commencement of the action was warranted by evidence of complaints by the patient for which the defendant did not order X-rays as he should have done and evidence of abdominal conditions due to the clamp; and the action was not barred by the two year statute of limitations, G. L. c. 260, § 4, as amended through St. 1960, c. 271.   [458–459]

An action for assault and battery against a surgeon who performed an operation in which a clamp was left in the patient's abdominal cavity when the incision was closed could not be maintained where the evidence did not show any intent on the defendant's part to leave the clamp in the cavity.   [459]

TORT.   Writ in the Superior Court dated February 21, 1962.

The action was tried before *Spring,* J.

*Morris N. Gould* for the plaintiff.

*Stanley B. Milton* (*Robert C. Milton* with him) for the defendant Chandler.

*James C. Donnelly, Jr.,* for the defendant Lentino.

REARDON, J.   In this action of tort involving alleged medical malpractice, the defendants presented motions for directed verdicts at the close of the evidence and the judge directed verdicts for the defendants on every count of the plaintiff's declaration.   The case comes to us on the plaintiff's exceptions to the action of the judge.

By writ dated February 21, 1962, the defendants, Dr. Charles F. Chandler and Dr. Joseph W. Lentino, both of Clinton, were sued by David B. Pasquale as administrator of the estate of his father, Nunzio Pasquale. The action was for damages both for pain and suffering and for wrongful death. Alleged in the declaration, in a number of counts, were: (1) negligence in the performance of an operation on the decedent; (2) failure to diagnose and treat his condition properly; (3) negligence in the care and treatment of the decedent in the years following the operation; (4) fraudulent concealment of a cause of action; and (5) assault and battery upon the decedent by means of a surgical instrument.

We briefly summarize the evidence most favorable to the plaintiff. On October 10, 1955, Nunzio Pasquale, seventy-three years of age, visited Dr. Lentino. He had been feeling ill for some time, was pale and emaciated, had lost weight, had "tarry stools," and had been subject to digestive disturbances. On October 13, 1955, Dr. Lentino had X-rays taken of Pasquale at the Clinton Hospital which indicated a bleeding gastric ulcer. Following hospitalization of Pasquale and a conference with Dr. Chandler, it was decided to perform surgery. A subtotal gastrectomy, removal of most of the stomach, including the ulcer, was performed on October 22, 1955, by Dr. Chandler with the assistance of Dr. Lentino. The operation required approximately three and one-half hours. Dr. Chandler did not make a count of the surgical instruments employed but did cause a count to be made of sponges and needles utilized in the operation. Some fifty to seventy-five clamps were used, including approximately twenty-five so called Kelly clamps. A Kelly clamp is similar in appearance to a pair of scissors, is approximately eight inches in length, with curved serrated jaws and a ratchet type lock. It is employed to control bleeding during the progress of an operation. One such clamp was left in the abdominal cavity of the patient when the incision was closed.

After several weeks of convalescence in the hospital, and more particularly after October 29, 1955, Pasquale was in

the exclusive care of Dr. Lentino who saw his patient on at least seventeen occasions, the last being April 7, 1961, less than one year before the commencement of this action. In 1955, when Pasquale went originally to Dr. Lentino, he provided for the taking of X-rays. In a visit on September 6, 1956, Dr. Lentino discussed the decedent's postoperative condition with him and cautioned him about his diet, stating that if gastric symptoms of which he was then complaining "did not clear up" Pasquale should "let him know and they would take an X-ray." There is a notation on a card in the doctor's files dated September 6, 1956, that Pasquale "was to have an x-ray of the stomach if heartburn continued." Dr. Lentino himself testified that on September 6, 1956, "he felt that if Mr. Pasquale's heartburn continued, after he went back on his diet and continued to take gelusil, that good sound medical practice would be to have an x-ray taken of this man's stomach . . . ." Following a fall by Pasquale in 1957 and a skull X-ray, the doctor "did nothing concerning . . . [Pasquale's] stomach condition because after having a blow on the head and possible concussion, it would have been poor judgment to subject him to any elaborate physical procedure . . . ." While Pasquale was in the hospital after his fall, the doctor determined that there was no serious complaint at that time about his stomach and did not order X-rays on the ground "that an x-ray at this time could not have ascertained the cause of his stomach complaint in his opinion." Pasquale again visited the doctor on April 5, 1957, complaining of heartburn and the doctor "ordered him to continue on his medication and go back on his diet and at this time, he told him that after he had been on his diet for a period of time, if he did not receive relief from his antacids, he was to let him know and he would take some x-rays." The doctor stated that on May 24, 1957, he was not of the opinion that an X-ray was "sound medical practice for this patient." Almost a year elapsed before he saw Pasquale again in April of 1958, at which time "he never asked Mr. Pasquale further about x-rays at the Clinton Hospital, he did not think that they

were necessary.'' At about this time Pasquale's son David was told by his father that Dr. Lentino had said that X-rays might be taken but did not indicate ''exactly when.'' In November, 1958, the doctor submitted a report to the Department of Public Welfare in which he classified Pasquale's ailment as a ''duodenal ulcer'' although Pasquale had no functioning duodenum and no ulcer. In April, 1959, in another public welfare report, the doctor represented that he had taken a ''GI series'' of X-rays. The following year he filed a report with the Bureau of Old Age Assistance indicating that a ''GI series'' had been done on Pasquale's ''GI tract'' and in this 1960 report he stated Pasquale was suffering from ''GI bleeding from duodenal ulcer,'' although at that time the plaintiff was experiencing no such bleeding. On three occasions in 1956 and 1957 the doctor's office cards relative to Pasquale contained notations relative to X-rays, including an appointment made for Pasquale at the Clinton Hospital which Pasquale did not keep. Dr. Chandler had previously testified that ''X-ray is the most important laboratory aid in the diagnosis of the disorders of the gastrointestinal tract.'' Dr. Lentino, during this time, never checked Pasquale's weight or tested his stools.

In June, 1961, Pasquale's son took him to Dr. Rudolph Utzschneider at the Fallon Clinic in Worcester. Dr. Utzschneider noted Pasquale's complaints, examined him, and recommended that he go to the hospital. In the hospital Dr. Utzschneider ordered X-rays, which revealed the presence of a foreign body in the patient's left side. The object was removed in an operation on July 26, 1961, and proved to be a rusted and broken Kelly clamp. The clamp had lodged within two portions of the patient's intestine and the two portions had become joined together by ''dense, congestive fibrous tissue.'' According to a pathologist, the portions of the large intestine ''in the immediate proximity to the clamp were chronically inflamed and congested.'' Pasquale improved somewhat following the operation but then his condition worsened and he died on September 3,

1961. A postmortem examination demonstrated that Pasquale had suffered from several problems, including multiple abdominal abscesses. Dr. Utzschneider assigned as the causes of death "[g]eneralized arteriosclerosis, pulmonary emboli and peritonitis." The death certificate carried the cause of death as "Multiple abcesses of the abdomen. ? Days."

This action was brought on February 21, 1962, five and one-half months after Nunzio Pasquale's death, seven months after the discovery of the clamp by X-ray, and six years, four months after the original operation.

1. The principal defence raised by both defendants was that the statutes of limitation had run. The relevant statute concerning wrongful death was G. L. c. 229, § 2C, and read in part as follows: "[A] person who by his negligence . . . causes the death of a person . . . shall be liable in damages . . . to be recovered in an action of tort, commenced . . . within two years after the injury which caused the death . . . ." In these circumstances the wrongful death action is foreclosed as against both defendants. The operation, i.e., the injury, was on October 22, 1955; the action was brought by writ dated February 21, 1962. See *Burns's Case,* 218 Mass. 8, 12; *Crosby* v. *Boston Elev. Ry.* 238 Mass. 564, 565–566; *Murphy* v. *Avery Chem. Co.* 240 Mass. 150, 153; *Sterling* v. *Leyland & Co. Ltd.* 242 Mass. 8, 13.

2. The statute of limitations concerning malpractice which was in force at the commencement of this action was G. L. c. 260, § 4. It read in relevant part as follows: "[A]ctions of contract or tort for malpractice, error or mistake against physicians, surgeons . . . shall be commenced only within two years next after the cause of action accrues."

*Capucci* v. *Barone,* 266 Mass. 578, 581, was an action against a surgeon who had left a sponge in the patient's abdominal cavity during an operation. The operation had taken place more than two years before the date on which the plaintiffs' writs were brought. In interpreting G. L.

c. 260, § 4, this court held that the claim of malpractice was barred on the ground that the statutory period begins to run at the time of the operation "and not when the actual damage results or is ascertained." This definition of "accrues" was relied upon in *Maloney* v. *Brackett,* 275 Mass. 479, 481, and has frequently been cited in similar cases in other States.[1]

Were it not for recent legislation, we would be disposed to reconsider the question of the time from which the statute starts to run in the light of the growing body of case law at odds with the *Capucci* doctrine which computed the statute's period from the date of the operation or act of malpractice.[2] We are, however, confronted by very recent legislative history in this field. In March of 1965, the Massachusetts House of Representatives considered a bill, House No. 530, which would have amended G. L. c. 260, § 4, by substituting the language, "and actions of contract or tort for malpractice, error or mistake . . . shall be com-

---

[1] For representative cases indorsing the approach of the *Capucci* case and citing it, see *Giambozi* v. *Peters,* 127 Conn. 380, 383; *Tantish* v. *Szendey,* 158 Maine, 228, 231; *Murray* v. *Allen,* 103 Vt. 373, 376. See also cases cited in 47 Cornell L. Q. 339, 358–364; 80 A. L. R. 2d 386.

[2] (A) The so called "California" rule has held that the statute of limitations begins to run upon the discovery of the foreign object which has been left in the body. *Huysman* v. *Kirsch,* 6 Cal. 2d 302, 312. *Waldman* v. *Rohrbaugh,* 241 Md. 137, 144–145 (dictum). *Fernandi* v. *Strully,* 35 N. J. 434, 442–443. *Seitz* v. *Jones,* 370 P. 2d 300, 302 (Okla. 1961). *Ayers* v. *Morgan,* 397 Pa. 282, 290, 292. *Morgan* v. *Grace Hosp. Inc.* 149 W. Va. 783, 792–794. *DeLong* v. *Campbell,* 157 Ohio St. 22, 30, 31 (dissent).

(B) There is a second group of cases in which an object was left in the abdomen and the court declined to follow the *Capucci* rule, applying instead some other rule to reach a result similar to the discovery rule. *Burton* v. *Tribble,* 189 Ark. 58, 61. *Rosane* v. *Senger,* 112 Colo. 363, 370. *Thatcher* v. *DeTar,* 351 Mo. 603, 608. *Sly* v. *Van Lengen,* 120 Misc. (N. Y.) 420, 421. *Gillette* v. *Tucker,* 67 Ohio St. 106, 127. *DeLong* v. *Campbell,* 157 Ohio St. 22, 25, 27.

(C) In another class of cases there was no abdominal surgery and the court declined to follow the *Capucci* rule. *Urie* v. *Thompson,* 337 U. S. 163, 169, 170. *United States* v. *Reid,* 251 F. 2d 691, 695 (5th Cir.). *Morrison* v. *Acton,* 68 Ariz. 27, 36. *Stafford* v. *Shultz,* 42 Cal. 2d 767, 778. *Pellett* v. *Sonotone Corp.* 55 Cal. App. 2d 158, 160. *Bowman* v. *McPheeters,* 77 Cal. App. 2d 795, 798. *Costa* v. *Regents of Univ. of Cal.* 116 Cal. App. 2d 445, 454. *Hemingway* v. *Waxler,* 128 Cal. App. 2d 68, 70. *Miami* v. *Brooks,* 70 So. 2d 306, 309 (Florida 1954). *Perrin* v. *Rodriguez,* 153 So. 555, 556 (La. App. 1934). *Johnson* v. *Caldwell,* 371 Mich. 368, 379. *Schanil* v. *Branton,* 181 Minn. 381, 382. *Borgia* v. *New York,* 12 N. Y. 2d 151, 155.

menced only within two years next after the injured party has knowledge of the facts which give rise to a cause of action but only within five years after the cause of action accrues."[3] That the legislation was ever proposed in this form is sufficient indication that G. L. c. 260, § 4, was understood by the sponsors of House No. 530 to have incorporated the *Capucci* interpretation of "accrues" in each of the several amendments enacted subsequent to the decision in that case.[4] Apart from that consideration, the last sentence of House No. 530 employed the word "accrues" as it was interpreted in the *Capucci* case.

The House of Representatives, in House No. 530, had before it a two year "sliding scale discovery rule" and a five year "outer limit" and, thus, the opportunity to afford recognition to both theories which have been expressed singly or in combination in statutes of limitation, i.e., the theory of "absolute repose" as well as the theory of "estoppel of the plaintiff." Prior to this proposal, G. L. c. 260, § 4, had apparently embraced only the theory of "absolute repose." House No. 530 was sent to the Senate with only one change; the five year "outer limit" was excised leaving only the two year "sliding scale discovery rule." During its third reading, House No. 530 was rejected by the Senate, with a substitute, Senate No. 924, being adopted. Senate No. 924 was a simple republication of G. L. c. 260, § 4, as it stood before, but extending for one

---

[3] This is the very form of the statute which was suggested by 47 Cornell L. Q. 339, 368, and which is presently in effect in Alabama (Ala. Code, Tit. 7, § 25 [1], 1960) and in Connecticut (Conn. Gen. Sts. Ann. § 52–584 [12], 1958).

[4] St. 1929, c. 29, §§ 1, 2. St. 1931, c. 458, § 5. St. 1933, c. 318, § 5. St. 1934, c. 291, § 4. St. 1937, c. 385, § 9. St. 1943, c. 409, § 4. St. 1955, c. 235, § 1. See *DeVincent* v. *Commissioner of Corps. & Taxn.* 348 Mass. 758, 761.

It is also relevant to note that the Massachusetts Legislature has chosen to provide for a six month "sliding scale" discovery rule with a three year "outer limit" in G. L. c. 260, § 4B, concerning hit and run accidents. In *DeLong* v. *Campbell*, 157 Ohio St. 22, 27–28, and in the dissent in *Fernandi* v. *Strully*, 35 N. J. 434, 457, it was stated that the coexistence of another statute of limitations which did provide for a discovery rule was further indication that the Legislature did not intend, in the absence of specific language to that effect, to import a discovery rule into a statute of limitations regarding malpractice.

year the period of limitations which that statute provided as follows: "Actions of contract or tort for malpractice . . . shall be commenced only within three years next after the cause of action accrues." Senate No. 924 became St. 1965, c. 302, and is now the law.

From this account of the legislative history of House No. 530, it is apparent that the Legislature, having in mind its previous acceptance of the *Capucci* case's interpretation of "accrues," intended to reject the theory of a "sliding scale discovery rule," notwithstanding the proposal of the five year "outer limit" to be placed upon actions of this type. The recent legislation would seem to be a reaffirmation and strengthening of what has been the legislative policy in the years since the *Capucci* case. The legislative intent implicit in c. 260, § 4, as it stood at the time of all the events in this case, required that the trial judge grant the defendant Chandler's motions for directed verdicts on the ground of the statute of limitations on the counts charging malpractice. His participation in the care of the patient ended on October 29, 1955, and any duty he had with regard to postoperative care ended on that day.

3. The alleged failure to diagnose and treat the patient properly following his operation could apply only to Dr. Lentino, as he alone treated him. Only three or four of Dr. Lentino's visits with Nunzio Pasquale came within the period of the statute of limitations. In our opinion, however, there was evidence sufficient to support a finding of negligence on the part of Dr. Lentino. He had treated the decedent for about six years. He and one other physician testified that examination by X-ray was proper medical practice in diagnosing such complaints as Pasquale's. An X-ray examination at the Fallon Clinic disclosed the presence of the clamp. Thus the jury could have found that Dr. Lentino did not employ that "reasonable degree of learning, skill and experience which is ordinarily possessed by others of his profession in the community where he practices, having regard to the current state of advance of the profession." *Riggs* v. *Christie,* 342 Mass. 402, 406. *Tallon*

v. *Spellman,* 302 Mass. 179, 182–183. The autopsy report and the death certificate taken in conjunction with the testimony of the pathologist and the surgeon at the Fallon Clinic would support a finding that the absence of proper professional treatment was a cause of Pasquale's discomfort and eventual death. That the operating surgeon is freed yet Dr. Lentino is subjected to possible liability for negligent care of his patient within two years of the commencement of this action is the result of G. L. c. 260, § 4.

4. There was insufficient evidence on which fraudulent concealment could have been found so as to delay the running of the statute.

5. The evidence does not show any intent to leave the eight inch clamp in the abdominal cavity. The allegations of assault and battery against the defendant Chandler must therefore fail.

6. It follows that the exceptions taken to the directed verdicts for the defendant Chandler are overruled, and the exceptions taken to the directed verdicts for the defendant Lentino are overruled as to counts 9, 10, 11, 12, 13, 14, 16 and 17 of the plaintiff's declaration, and sustained as to counts 15 and 18.

*So ordered.*